USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/15/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
PRISTINE JEWELERS NY, INC.,                                       :
:
Plaintiff,                                  :
:       18-cv-12155 (LJL)
-v-                                                       :
:       AMENDED FINDINGS OF
:       FACT AND
ADRIEN BRONER, RAVONE LITTLEJOHN, and                             :       CONCLUSIONS OF LAW
ABOUT BILLIONS, LLC,                                              :
:
Defendants.                                 :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

This case concerns a dispute over payments for the sale of jewelry. Plaintiff Pristine Jewelers, NY, Inc. ("Pristine" or "Plaintiff") brings this action against defendants Adrien Broner ("Broner"), About Billions, LLC ("AB"), and Ravone Littlejohn ("Littlejohn" and collectively with Broner and AB, "Defendants") seeking damages under the following legal claims and theories: "Goods Sold and Delivered" (Claim One), Dkt. No. 1 ("Compl.") ¶¶ 9-128; "Account Stated" (Claim Two), *id.* ¶¶ 129-132; "Quantum Meruit" (Claim Three), *id.* ¶¶ 133-138; "Dishonored Check" (Claim Four), *id.* ¶¶ 139-144; "Personal Liability on Dishonored Check" (Claim Five), *id.* ¶¶ 145-151; "Fraudulent Inducement" (Claim Six), *id.* ¶¶ 152-163; "Attorney's Fees" (Claim Seven), *id.* ¶¶ 164-169; and "Contractual Interest of 1.5% per month" (Claim Eight), *id.* ¶¶ 170-174. The Court previously approved a stipulation of settlement and order of dismissal between Plaintiff and Defendants Broner and AB. Dkt. No. 35. Littlejohn was not party to the stipulation and order.

Pristine and Littlejohn agreed to try the case between them by paper submission to the Court. On May 28, 2021, each party submitted a set of proposed findings of fact and conclusions of law along with the deposition transcripts and exhibits they agreed would constitute the trial

record in this case.[1]  The record primarily consists of the deposition transcripts of Littlejohn and of Ari Davidov ("Davidov"), a representative of Pristine.  The following constitute the Court's findings of fact and conclusions of law.  Where the Court has not accepted testimony of Littlejohn or Davidov, that is because the Court has concluded that such testimony either is not credible or is against the weight of the evidence.

## FINDINGS OF FACT

Plaintiff Pristine Jewelers NY, Inc. is a New York corporation, located at 44 West 47th Street, New York, NY.  Avi Davidov is one of the two owners and officers of Pristine.  Ofir Benshimon is the second owner and officer of Pristine.  Pristine is in the business of selling jewelry, including custom jewelry.

Adrien Broner is a professional boxer who resides in Weston, Florida.

About Billions, LLC is a domestic for-profit LLC, registered in the state of Ohio, and is in the business of promoting amateur and professional fighters, recording artists, and live events.[2]  It performed boxing promotional services for several boxers in addition to Broner.  AB's CEO and only employee at all times relevant herein was Littlejohn who is a resident of the

---

[1] *See, e.g.*, *U.S. Fire Ins. Co. v. SS "LIONS GATE BRIDGE"*, 1997 WL 10923, at *5 (S.D.N.Y. Jan. 10, 1997) (relying on deposition transcripts, affidavit, and stipulated facts as the entire trial record where parties have consented to such a trial and neither has sought to cross-examine any witness beyond the examination reflected in the proffered deposition transcripts); *E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC*, 2015 WL 5707145, at *1 (S.D.N.Y. Sept. 29, 2015) (conducting bench trial on the papers pursuant to the parties' consent); *Lightbox Ventures, LLC v. 3rd Home Ltd.*, 2018 WL 1779346, at *1 (S.D.N.Y. Apr. 13, 2018) (same); *see also O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011) (holding that district court may conduct a "bench trial 'on the papers'" so long as it is "clear that the parties consent to a bench trial on the parties' submissions"); *cf. Sacerdote v. New York Univ.*, 9 F.4th 95, 118 (2d Cir. 2021) ("[W]e have approved of the practice of taking direct testimony by written submissions in bench trials.").
[2] The name apparently stems from a YouTube series called About Billions started by Broner.  It was Broner's idea to form a promotional company and to use the name in connection with that company.

state of Ohio.  AB's only business is the promotion of small-time fights or "ballroom" fights.  It has two accounts at PNC Bank.  At the times relevant herein, the accounts were funded with the proceeds of boxing fights or by Broner's mother (with the proceeds of Broner's fights) and were used primarily to fund expenses for Broner, such as hotel bills, gasoline, cellphone expenses, or gifts for his girlfriend.

This case concerns sales in October 2017 and December 2017 of jewelry designed by Pristine for Broner.  The payments for the jewelry were made in the form of checks, drawn on the bank account of AB and signed by Littlejohn, that were returned for insufficient funds.  Pristine sued Broner, AB, and Littlejohn but settled with Broner and AB.  Pristine now seeks to recover from Littlejohn the sums due on the checks it was unable to recover from Broner and AB.  The factual questions in the case concern the relationships among Pristine, Broner, AB, and Littlejohn and the circumstances under which the jewelry came to be purchased and Littlejohn came to sign the checks.

The sales originated in a meeting between Davidov and Broner some time in 2017 at the Marriott Hotel in downtown Brooklyn.  The meeting was arranged by a person introduced to Davidov only as "B-Luck"[3] who was also present at the meeting.  Broner advised Davidov that he was unhappy with his jeweler at the time.  Davidov showed Broner pictures of the customization Davidov was doing, and Broner asked Davidov to prepare for him "renderings" of a "whole new setup," i.e., a three-dimensional model of what the jewelry would look like.  Tr. Ex. 15 at 12, 15.  It was contemplated that a setup would consist of a watch, necklace, chains, bracelets, and perhaps a ring.  Broner specified that he wanted a pendant with the initials "AB," a

---

[3] B-Luck's real name is George Reid, and he was engaged in graphic design for AB.

3

diamond necklace, and a bracelet to match his necklace. Davidov understood that "AB" stood for About Billions, the company Broner stated that he and Littlejohn had started.

Approximately two weeks after the initial meeting at the Marriott Hotel, Davidov showed the renderings to Broner over FaceTime. Between the initial meeting and this FaceTime call, Davidov and Broner had conversations during which they discussed the individual prices of the items he was ordering. Broner agreed to pay the price that Davidov quoted him. Broner did not say that anyone else would pay. Davidov asked for a down payment, but Broner refused and said he would pay for all of the items once they all were completed. Davidov then spent about 30 to 60 days manufacturing the jewelry. During that period, he spoke several times with Broner and did not have any conversations with Littlejohn.

On October 13, 2017, Davidov met with Broner at Pristine's store in Manhattan to show the pieces of jewelry he had manufactured. Broner agreed to purchase the jewelry and also selected several items of women's jewelry while he was at the store. Davidov prepared a sales order for Broner's purchase of all the jewelry ("October Sales Order"). The October Sales Order listed the customers as "Adrien Broner/About Billions LLC." Tr. Ex. 13, Ex. A at 2. It also itemized ten pieces of jewelry, including seven items manufactured for Broner and the three pieces of ladies' jewelry, and noted two additional ladies' bracelets. The total sales price of the pieces of jewelry listed on the October Sales Order was $1,190,000, which was itemized as follows: $1,150,000 for the ten itemized pieces plus an additional $40,000 for "2 lady's bracelets." *Id.* The October Sales Order also reflected a $350,000 credit given to Broner, reflecting Broner's trade-in to Pristine of the pendant and necklace from his prior jeweler. The total amount owed by Broner, pursuant to the October Sales Order, was therefore $840,000. At the top of the October Sales Order, on the line for payment terms, Davidov handwrote: $500,000

4

by December" and "$300,000 by" without a date. *Id.*; Tr. Ex. 15 at 58. The sales order reflected that the jewelry was being picked up at the store on October 13, 2017, but Broner did not leave the store with the jewelry because he did not have payment on him at the time.

Later that same day, Davidov and Davidov's partner Benshimon met with Broner, Broner's girlfriend, and Littlejohn at Rocco's Tacos and Tequila Bar in the Marriott Hotel at 339 Adams Street, Brooklyn, NY. Davidov brought the jewelry listed on the October Sales Order with him and gave it to Broner. In exchange, Littlejohn presented Davidov two checks. The checks were drawn on a bank account at PNC Bank in the name of AB and with an account number ending in 4027 for which Littlejohn was an authorized signatory.[4] Both checks were signed by Littlejohn and were post-dated. There is no indication on the face of the checks that Littlejohn was signing in a representative capacity. The checks bear the imprint "About Billions LLC" and an address. Check number 220, drawn on PNC Bank, was dated December 15, 2017 and was in the amount of $540,000, and check number 221, drawn on PNC Bank, and dated February 1, 2018 was in the amount of $300,000. Broner and Littlejohn explained to Davidov that the checks were post-dated to correspond to dates Broner would be participating in professional boxing matches and on which he would be paid for those bouts. The funds necessary to satisfy the obligation to Pristine would be generated as a result of payments received by Broner for bouts on those dates.

On the October Sales Order, Davidov listed the numbers and amounts of the two post-dated checks. In addition to Broner's signature, the October Sales Order included Littlejohn's signature. In Davidov's words, Littlejohn signed because he "was the one that was

---

[4] The PNC Account Registration and Agreement reflect that Littlejohn was both the manager and the owner of AB.

giving the checks" and "Adrien [Broner] told [Davidov] he's going to be the one taking care of it," which Davidov understood meant that Littlejohn would be paying the bill. Tr. Ex. 15 at 37-38. In exchange, and at Broner's request, Davidov gave Littlejohn a Rolex watch as consideration for Littlejohn's agreement to pay Pristine from the AB account.

The next meeting among the parties occurred on December 13, 2017 at Pristine's store in Manhattan. Broner and Littlejohn met with Davidov, and Broner told Davidov that the majority of the jewelry that was the subject of the October Sales Order had been lost or stolen.[5] Broner asked Davidov to create a new "setup" for him. Tr. Ex. 15 at 62. Davidov agreed to sell Broner five pieces of jewelry to replace some of the pieces that Broner alleged had been stolen.

Davidov created a new sales order, which listed the five pieces that Davidov agreed to make for Broner for a total of $400,000 ("December Sales Order"). Like the October Sales Order, the December Sales Order listed the customer as "Adrien Broner/About Billions LLC." Tr. Ex. 13, Ex. B at 2. The payment terms were "$500,000 by 2/15/18." *Id.* At the bottom of the December Sales Order, Davidov wrote "Post Date checks on 1) 12/15/17 - $200,000"; 2) 2/15/17 - $200,000." *Id.* There is no signature on the line for customer approval. There are also no other signatures on the sales order. At some later date, Davidov wrote on the December Sales Order that the amount due had been reduced by a $50,000 wire received on June 19, 2018 and an additional $50,000 wire received on August 3, 2018.

At the store that day, Broner gave Davidov the two post-dated checks also drawn on the AB account at PNC ending with 4027. Check number 223 was dated December 15, 2017 and

---

[5] The testimony that the jewelry was stolen is dubious. It is based solely on Broner's statements that the jewelry was stolen. There is no evidence that a claim was submitted to insurance for the lost jewelry or that Broner received any compensation for it. There is also no evidence that a police report was ever filed.

was in the amount of $200,000, and check number 224 was dated February 15, 2018 and was in the amount of $200,000. Both checks bear the imprint "About Billions LLC" with an address and were signed by Littlejohn without any indication he was acting in a representative capacity. At the meeting, Davidov also asked whether payment would be made in two days, when it was due, and was told by Broner that the payment would be there and "Ravone [Littlejohn] is on top of it." Tr. Ex. 15 at 69. Pristine gave Broner some of the jewelry and shipped some of the jewelry later.

Notwithstanding Broner's statement, Littlejohn told Davidov that there would not be sufficient funds in the bank to pay Davidov in December 2017 and that he should wait to cash the check. Littlejohn told Davidov sometime around December 15, 2017 that whatever fight was supposed to happen then was not going to happen.[6] Between December 2017 and April 2018, Davidov and Littlejohn had numerous conversations about Broner's fights being delayed. During that time, Davidov had "[m]aybe one" conversation with Broner during which Broner told Davidov that Littlejohn would "take care" of Pristine being paid. Tr. Ex. 15 at 106. The first fight after October 2017 took place on April 21, 2018 against Jesse Vargas. Davidov was advised by both Broner and Littlejohn to deposit the checks after the Vargas fight because Broner was being paid for the fight and that as a result money would be paid to the bank so the check would be honored.[7]

On May 2, 2018, Davidov deposited the $540,000 check post-dated December 15, 2017 (check 220) for partial payment of the October purchase. On May 15, 2018, Davidov deposited the $200,000 check also post-dated December 15, 2017 (check 223) for partial payment of the

---

[6] Davidov testified that "they kept switching fight dates." Tr. Ex. 15 at 99.
[7] Littlejohn denies telling Davidov that he had the money, but the Court finds that testimony not to be credible.

December purchase. Both checks were dishonored for insufficient funds. Davidov was informed on May 7, 2018 that check number 220 was dishonored for insufficient funds; he was informed on May 18, 2018 that check number 223 was dishonored for insufficient funds. Davidov did not try to deposit the two checks post-dated to February 2018 (checks 221 and 224) because the other two checks had bounced, and Littlejohn had told him there was no money in the account.

Davidov complained to both Littlejohn and Broner that he had not been paid. Littlejohn said he did not know why the check bounced and said he would find out by talking to Broner's mother and an individual named Al Haymon. Littlejohn stated that Broner's mother handled the money and that Davidov should speak to her. When Davidov spoke to Broner's mother, she said to speak to Littlejohn and to never call her again. In or about May or June 2018, Littlejohn proposed a monthly payment agreement.

On or about June 2, 2018, Broner reached an agreement with Davidov for Broner to pay $1.24 million to Pristine for the jewelry sold on October 13, 2017.[8] Broner agreed that Davidov would receive $50,000 on or about the 15th day of each month beginning in June 2018 and continuing until October 2018, resulting in a total payment of $250,000. The parties also agreed that Davidov would receive an additional $400,000 within ten business days following Broner's next bout which was then contemplated for October 2018. The agreement further provided that Davidov would receive an additional $640,000 within ten business days following Broner's second bout then contemplated for the first or second quarter of 2019. All in all, Davidov would be paid in full a grand total of $1,290,000. Davidov received two payments of $50,000, but by July 2018, the payments stopped.

---

[8] It does not appear that the agreement was signed by Broner until June 18, 2018.

After the payments stopped, Davidov met with Littlejohn and Broner in November 2018 to discuss the status of the payments. Davidov communicated with Littlejohn and Broner and threatened to sue if Pristine was not paid.[9] Littlejohn reassured Davidov, but Pristine was not paid.

## PROCEDURAL BACKGROUND

Plaintiff filed its complaint naming Broner, AB, and Littlejohn on December 24, 2018, Dkt. No. 1, and served the summons and complaint on each of Broner, AB, and Littlejohn in January 2019. After the action was commenced, Pristine reached a settlement with Broner and AB, which resulted in Pristine being paid an additional $252,000. On June 20, 2019, this Court (Hon. Valerie Caproni, USDJ) approved the settlement agreement between Pristine and Defendants Broner and AB and dismissed Pristine's claims against Defendants Broner and AB, while continuing to retain jurisdiction over the enforcement of the settlement agreement. Dkt. No. 35 at 2. The Court also approved the stipulated dismissal of Pristine's claim against Defendant Littlejohn for $12,000 related to an August 8, 2018 invoice. *Id.*, Ex. B at 1-2. Pristine continued to litigate the remainder of the case against Littlejohn, and the parties agreed to try the case to the bench by submission. Dkt. No. 90.

## DISCUSSION

Plaintiff pursues two claims against Defendant Littlejohn: Claim Five for personal liability on a dishonored check and Claim Six for fraudulent inducement.[10] The Court discusses the two claims in turn.

---

[9] In between, in August 2018, Broner purchased a pair of earrings from Pristine. Pristine agreed to sell him the earrings because it believed it was going to be paid for the prior purchase.

[10] Plaintiff does not address the following claims and therefore the Court deems them to be abandoned to the extent that they purported to state a claim against Littlejohn: Claim One (goods sold and delivered); Claim Two (account stated); Claim Three (quantum meruit); Claim Four (dishonored check); Claim Seven (attorney's fees); and Claim Eight (contractual interest of 1.5%

I.      **Personal Liability for Dishonored Checks**

Plaintiff seeks to hold Littlejohn liable for the four checks he signed on the account of AB: check 220 in the amount of $540,000 and check 221 for $300,000 for the October purchase, and checks 223 and 224 each in the amount of $200,000 for the December purchase. Checks 220 and 223 were presented and not honored. Plaintiff did not present checks 221 and 224 because Davidov was informed that there would be insufficient funds to honor them.

Plaintiff's theory is based on the New York Uniform Commercial Code Section 3-403(2)(b). Section 3-403(2) provides:

> An authorized representative who signs his own name to an instrument
>
> (a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;
>
> (b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.
>
> (3) Except as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity.

N.Y. U.C.C. Law § 3-403(2).

It is not disputed that Littlejohn was an "authorized representative" who signed his own name to the four checks, that the four checks constituted negotiable instruments, *see* N.Y. U.C.C. § 3-104(1), and that their negotiability was not affected by the fact that the checks were post-dated, *see* N.Y. U.C.C. § 3-114(1) ("The negotiability of an instrument is not affected by the fact that it is undated, antedated or postdated."). It also cannot be seriously disputed, and the Court finds, that the checks named "the person represented" (i.e., AB) but do not show that when

---

per month).

10

Littlejohn signed he "signed in a representative capacity." For example, he did not add the language "by" or "agent" or even his title to the instrument. *See Finnish Fur Sales Co., Ltd. v. Juliette Shulof Furs, Inc.*, 770 F. Supp. 139, 147 (S.D.N.Y. 1991) (noting that authorized representative will not be personally bound when using language such as "by" or "agent"). The parties dispute, however, whether the facts and circumstances are such that Littlejohn is personally liable to Pristine for the bank's failure to honor the checks drawn on the AB account.

The leading case on this question—the personal liability of an authorized representative who signs his own name to a negotiable instrument that also names the principal represented—is the New York Court of Appeals' decision in *Rotuba Extruders, Inc. v. Ceppos*, 385 N.E.2d 1068 (N.Y. 1978). In payment for goods sold and delivered to the corporation of which he was the Chief Executive Office and of which his relatives were the other principals, the individual defendant signed a note beneath the name of his corporation, but "[n]o word or symbol, not even as much as a 'by' or 'for', appeared to signify that [he] was acting in a representative capacity in affixing his signature." *Id.* at 1069. Plaintiff claimed that the individual defendant was personally liable under section 3-403(2)(b) when the corporation failed to satisfy the note. The Appellate Division ruled that there were questions of fact precluding summary judgment because defendant claimed that the notes were ambiguous on their face and that he intended to sign only in a representative capacity. But the Court of Appeals reversed.

The New York Court of Appeals stressed the importance of certainty in the law of negotiable instruments. It held that "[t]o escape personal liability [under section 3-403(2)(b)], *the signer has the burden* to 'establish' an agreement, understanding or course of dealing to the contrary." *Id.* at 1071 (emphasis added). The burden is not discharged by "the mere self-serving allegation of the signer's subjective intent to sign as a representative." *Id.* Unless the defendant

11

makes "*an affirmative demonstration* that the taker of the note knew or understood that the signer intended to execute the instrument in a *representative status only,* there can be no defense that, notwithstanding the form of the note, representative liability was otherwise established between the parties." *Id.* (internal quotation marks omitted) (emphasis added).

In other words, "[e]ven where . . . the face of a check indicates that funds are drawn from a corporate account, the individual who signs the check may be personally liable under section 3-403 unless he specifically indicates that he is signing in a representative capacity." *Finkel v. Romanowicz*, 577 F.3d 79, 88 (2d Cir. 2009). Indeed, following *Rotuba Extruders*, New York courts have "strictly construed [section 403(2)(b)] as imposing personal liability on a maker of a check who fails to indicate his representative capacity on the instrument." *In re Golden Distrib., Ltd.*, 134 B.R. 770, 774 (Bankr. S.D.N.Y. 1991); *see also Finkel*, 577 F.3d at 88 (noting that signer has the burden to establish an agreement, understanding, or course of dealing to the contrary); *Gesualdi v. Torretta Trucking Inc.*, 2012 WL 1102803, at *3 (E.D.N.Y. Mar. 12, 2012), *report and recommendation adopted,* 2012 WL 1103179 (E.D.N.Y. Apr. 2, 2012) (granting default judgment against individual who signed corporate check); *BBTOD, Inc. v. FTS Int'l, Inc.*, 807 N.Y.S.2d 379, 380 (2d Dep't 2005) (holding defendant personally liable when "he signed his name to corporate checks without indicating whether he did so in his representative capacity"); *Finnish Fur Sales*, 770 F. Supp. at 147 (holding individual liable for debt of corporation where individual signed above the typed name of the corporation without indicating she was signing as an agent); *Carador v. Sana Travel Serv., Ltd.*, 700 F. Supp. 787, 791 (S.D.N.Y. 1988) (holding signer of corporate check personally liable where face of instrument did not put taker on notice that maker was signing in a representative capacity only), *aff'd*, 876 F.2d 890 (2d Cir. 1989); *Tropical Ornamentals, Inc. v. Visconti*, 495 N.Y.S.2d 729, 730 (2d

Dep't 1985) (holding signer of check personally liable where the checks do not bear any indication that they were signed in a representative capacity). "While this rule may seem harsh, the rule is in keeping with the general intent and purpose of the negotiable instrument law to protect holders in due course. Commercial paper must be permitted to be freely negotiable without undue risk." *In re Golden Distributors*, 134 B.R. at 774 (quoting *Fin. Assocs. v. Impact Mktg. Inc.*, 394 N.Y.S.2d 814, 815 (N.Y. Civ. Ct. 1977)).

For Littlejohn to avoid personal liability, it is not enough that the checks were tendered in exchange for goods delivered to Broner and AB. *See Rotuba Extruders*, 385 N.E.2d at 1069 (notes tendered in payment for goods sold and delivered to Kenberg Lighting Industries); *In re Golden Distributors, Ltd.*, 134 B.R. 766, 770 (Bankr. S.D.N.Y. 1991) (check tendered in satisfaction of represented entity's indebtedness). Nor is it sufficient that AB might also be liable for payment on the check. *Carador*, 700 F. Supp. at 791 (holding both corporate defendant and individual defendant liable). That is because "Section 3-403 aims to foster certainty and definiteness in the law of commercial paper, requirements deriving from the necessity for takers of negotiable instruments to tell at a glance whose obligation they hold." *Rotuba Extruders*, 385 N.E.2d at 1070 (internal quotation marks omitted). A defendant must show that the taker of the note had the understanding, or that there was an agreement or course of dealing showing, that the signer would not be personally accountable for checks drawn on the account for which he acted as representative. *See In re Golden Distrib.*, 134 B.R. at 775.

Littlejohn has not satisfied his burden of demonstrating an agreement, understanding, or course of dealing that establishes that Pristine knew or understood that Littlejohn was obligating AB only and not himself personally. First, Littlejohn has not established a course of dealing, much less one that would give rise to an understanding that Littlejohn was obligating only AB.

13

There were only two transactions between the parties—one in October 2017 and the other in December 2017—and, in connection with the first, Littlejohn signed the sales order as well as the checks. There was no prior relationship between the parties that would give rise to an understanding that Littlejohn was signing only in a representative capacity. *See Rotuba Extruders*, 385 N.E.2d at 1071-72 (no course of dealing established when defendant could only point to a single and remote prior transaction); *cf. Combine Int'l v. Berkley*, 529 N.Y.S.2d 790, 792 (1st Dep't 1988) (finding that parties understood through a course of dealing over seven years that individual was signing only in his representative capacity).

Littlejohn also has not established the existence of an agreement or understanding—tacit or explicit—by which Littlejohn would be signing only in a representative capacity. Littlejohn devoted much attention in the deposition that was offered as trial testimony in this case to the facts that Davidov negotiated with Broner and not anyone else over the sales price for the jewelry and that the jewelry was designed for and sold to Broner. Littlejohn proved those facts. But the fact that Broner negotiated the price and purchased the jewelry does not answer the question whether when Littlejohn tendered a check that bore his signature and the imprint of AB he was obligating only AB or both AB and himself. To the contrary, the Court credits the testimony of Davidov that he understood that Littlejohn signed the October Sales Order because "he was the one that was giving the checks" and that he came to that understanding because Broner said that Littlejohn was "going to be the one taking care of it" meaning "[p]aying the bill." Tr. Ex. 15 at 37-38. In other words, Littlejohn "would take care of it." *Id.* at 39. As Davidov testified, when he delivered the jewelry to Broner at the restaurant in October 2017, what he had in exchange was a "[p]romise to be paid by Ravone [Littlejohn] and by Adrien [Broner]." *Id.* at 52.

14

That conclusion is only reinforced by the testimony, supported by documentary evidence, that Davidov and Pristine provided a Rolex watch to Littlejohn in connection with the transaction.[11]  The testimony is that Davidov provided the watch to Littlejohn at the store either in October or in December after Broner requested it because Littlejohn "would be the one taking care of [Davidov] in consideration" or "[h]e's the guy that will be taking care of the bill."  Tr. Ex. 15 at 53, 164; *id.* at 52 ("Ravone [Littlejohn] got a Rolex from us as consideration that he would also take care of the payment."); *id.* at 54 ("Ravone [Litlejohn] would be paying the bill."); *id.* at 164 ("Adrien [Broner] had told me to -- to give [Littlejohn] a Rolex in consideration that he would be taking care of everything.").  If only AB, and not Littlejohn, were responsible for the checks, there is no good reason why Littlejohn—and not AB—would be receiving consideration.  At a minimum, the evidence corroborates Davidov's understanding that in selling the jewelry he would be getting the credit not only of Broner but also of Littlejohn.

Indeed, what is telling from the trial record is the absence of any evidence of discussion with Davidov or Pristine about AB that would suggest that Davidov or Pristine understood that AB was even involved substantively in the transaction, much less that AB—and not Littlejohn—would be standing behind the checks provided to Davidov.  In that sense, this case is further afield from *Rotuba Extruders* and the cases cited by the parties.  In those cases, the courts held that the individual who signed a corporate check or note without an indication or understanding that he was signing in only a representative capacity was liable even though the consideration for

---

[11] Davidov testified that he gave the watch to Littlejohn in October 2017.  Littlejohn testified that Davidov gave him the watch, at Broner's request, at his shop in December 2017.  Tr. Ex. 14 at 8, 61-63.  Broner told Littlejohn that he could have the watch either because "you're obviously spending a lot of money with him," *id.* at 9, or "I deserved it, he [Broner] was spending a lot of money," *id.* at 64.  The testimony is ambiguous.  The difference between October 2017 and December 2017 is immaterial to the Court's decision.

the check was provided to the corporation and not to the individual. In this case, by contrast, there is no evidence that Pristine provided anything to AB (save putting AB's name on the sales orders). The jewelry was provided to Broner. Thus, there would have been no reason for Davidov to believe that AB—but not Littlejohn—was liable on the checks.

Littlejohn argues that Pristine and Davidov had an understanding that Littlejohn would not be paying from his personal funds because the checks were dated to correspond with the dates on which Broner would have bouts and would be paid for his performance. Littlejohn relies on Plaintiff's averment in paragraph 64 of the complaint that "Broner represented and promised to pay the Plaintiff from the proceeds of 'April 2018 Fight' for both the 'Plaintiff's October, 2017 Jewelry Order' and the 'Plaintiff's December, 2017 Jewelry Order.'" Dkt. No. 1 ¶ 64. He also relies on Davidov's admission in testimony that Davidov understood that the funds for the payments due on the checks would come from amounts received by Broner for participation in the bouts and that it was on that understanding that he allowed Broner to take the jewelry pieces. Additionally, Littlejohn points to the language in the June 2018 agreement among Pristine, Broner, and AB to the effect:

> 2. Avi Davidov will receive 400k within 10 business following Adrien Broners [sic] next bout currently contemplated for October 2018.
>
> 3. Avi Davidov will receive 640k within 10 business days following Adrien Broners [sic] second bout which is currently contemplated for the 1st or 2nd quarter of 2019.

Tr. Ex. 13, Ex. I at 2.

However, that Davidov understood that the money to pay Pristine would be generated from the bouts does not in any way support the notion that he understood that only Broner and AB and not Littlejohn personally would be obligated to pay Pristine what it was owed— regardless of the ultimate source of the funds. Davidov did not take the checks on a conditional basis to be paid only if Broner fought and only from the fight proceeds. The checks represented

16

unconditional obligations to pay. *Cf. Carador*, 700 F. Supp. at 789-90 ("A check is not a negotiable instrument if the drawer writes on it a promise, order, obligation or power, which, when examined on its face, in any way limits the drafter's unconditional promise to pay." (citing N.Y. U.C.C. § 3-104(1)(b))). When Davidov accepted the checks in payment for the jewelry, Davidov became a holder in due course: He took the checks for value, in good faith, and without notice of any defense or claim to it. N.Y. U.C.C. § 3-302(1). He thus was entitled to assume, when he turned over the jewelry, that he was doing so in exchange for the promise of *both* Broner and Littlejohn that he would be paid.

It may be that Littlejohn himself understood that the funds to pay Broner would come from fighting proceeds Broner earned and that Littlejohn himself would not be out of pocket any money as a result of signing and tendering the checks to Davidov. But this amounts to "mere self-serving allegations of the signer's subjective intent to sign as representative." *Rotuba Extruders*, 385 N.E.2d at 1071; *see also BBTOD*, 807 N.Y.S.2d at 380. If this was Littlejohn's understanding, that is a matter between Broner and Littlejohn. It does not deprive Pristine and Davidov of the benefit they received when they were given a check signed by Littlejohn and bearing the imprint of AB.

## II.     Fraudulent Inducement

Plaintiff argues in the alternative that Littlejohn is liable for fraud under New York law for representing to Davidov that Pristine would be paid when Broner, Littlejohn, and AB had no intention to pay him. Plaintiff claims that by post-dating the checks Littlejohn made a representation that Pristine would be paid on those particular dates when they knew Pristine would not be paid. Plaintiff claims the fraud was exacerbated because AB's bank account at PNC was used for personal needs and was severely undercapitalized.

The essential elements of a claim of fraud under New York law are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995)).  The elements of fraud require "proof by clear and convincing evidence." *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 607 (N.Y. 1999); *see also Ferreyra v. Arroyo*, 149 N.E.3d 47, 47 (N.Y. 2020) (stating that "the bar for establishing fraud is a high one" and that clear and convincing evidence is "a standard that has been defined as proof that makes it highly probable that the alleged activity actually occurred" (internal quotation marks omitted)).

Plaintiff relies for the most part on the evidence that Littlejohn used the AB bank account at PNC for non-business expenses such as to pay Broner's girlfriend and to pay Broner's childcare without paying the sums due to Pristine.  Plaintiff also relies on another case alleging that, subsequent to Broner and Littlejohn receiving jewelry without paying for it, the two obtained jewelry from yet another retailer (this one in Las Vegas, Nevada) without paying.

Plaintiff has not proven that Littlejohn committed fraud, much less by clear and convincing evidence.  There is no evidence that Littlejohn made any false representations upon which Pristine relied.  Plaintiff argues that the checks Littlejohn presented made implied representations that Pristine would be paid.  Aside from the checks, the most that Plaintiff points to are the statements from Broner that Littlejohn was personally responsible for making sure that Plaintiff would be paid.  However, "the act of giving a postdated check is not in itself evidence of fraud." *Alpha Aromatics, Inc. v. Frisone*, 270 N.Y.S.2d 493, 494 (N.Y. Dist. Ct. 1966)

(quoting *Azzarello v. Richards*, 99 N.Y.S.2d 597, 599 (N.Y. Mun. Ct. 1950)). "Fraud cannot be predicated upon nonperformance of a future promise, and a postdated check is a mere promise to discharge a present obligation at a future date." *Id.* (quoting *People v. Mazeloff*, 242 N.Y.S. 623, 625 (1st Dep't 1930)). The question is whether Littlejohn "had any intention of placing sufficient funds in the account on which the checks were drawn to insure that the postdated checks would be honored upon presentation." *Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F. Supp. 577, 580 (E.D.N.Y. 1982). But especially with respect to the checks tendered to Davidov in October 2017, there is no evidence that Littlejohn knew at that time the checks would not be honored. In his interrogatory answers, Littlejohn stated that he was not aware until one week after Broner's April 2018 bout that there would not be sufficient funds in the PNC account to cover the payment of the checks. Tr. Ex. 3 ¶ 13.

The case is closer with respect to the checks tendered to Pristine on December 13, 2017. The first of those two checks was post-dated December 15, 2017. But the fight that would generate the proceeds necessary to satisfy the check was rescheduled. Plaintiff was informed of that fact sometime before December 15, 2017 since Pristine chose not to present the check at that time and waited until the spring of 2018 at Littlejohn's request after the bout was delayed. Even as to these checks, however, the evidence is ambiguous and not sufficient to support a fraud verdict. It is not clear from the record when Littlejohn knew that the fight was not going forward and the checks would not be honored. Nor is it clear that Pristine relied on a representation that the check would be honored in December when it understood that the source of the funds would be a fight that could be rescheduled and when it so readily (and seemingly without complaint) agreed to wait until after a fight in the spring to present the checks for payment. Indeed, it is

telling that the dates on which the checks would be presented were selected by Defendants. There is no evidence that Pristine stated that the checks would have to be paid by a date certain.

There is also not sufficient evidence that Littlejohn acted with intent to defraud. He had no particular motive to defraud. The Court is convinced that the jewelry was destined for Broner. Plaintiff has not offered any reason why Littlejohn would present AB checks to Davidov in October and December 2017 and postdate them for specific dates if he knew that the checks would not be honored on those specific later dates. There is also no evidence that Littlejohn knew that the checks would not be honored or was reckless in that regard. Plaintiff did establish that Littlejohn would look at the balance in the PNC account on a regular basis and would know the funds that were in that account on any specific date. But that evidence does not get Plaintiff where it needs to be in this case. The checks were post-dated and they were post-dated to dates on which Broner was expecting to receive proceeds. Thus, whatever the balance in the account might have been in October and December 2017 immediately before Littlejohn presented the checks would not establish that Littlejohn knew that there would be insufficient funds much later when the checks were presented.

## CONCLUSION

For the foregoing reasons, the Court enters a verdict for Plaintiff on Claim Five and for Defendant Littlejohn on Claim Six. The parties are directed to meet and confer regarding a proposed form of judgment and to file with the Court a proposed judgment by October 29, 2021.

SO ORDERED.

Dated: October 15, 2021
      New York, New York

                                        LEWIS J. LIMAN
                                  United States District Judge